COURT OF APPEALS
DECISION
DATED AND FILED

July 8, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.** **2024AP2294-CR**
**2024AP2295-CR**
**STATE OF WISCONSIN**

Cir. Ct. Nos. 2021CF878
2021CF1938

**IN COURT OF APPEALS**
**DISTRICT II**

STATE OF WISCONSIN,

  PLAINTIFF-RESPONDENT,

 V.

ANTONIO V. ANDERSON,

  DEFENDANT-APPELLANT.

APPEALS from judgments of the circuit court for Waukesha County: JENNIFER R. DOROW, Judge. *Affirmed*.

Before Neubauer, P.J., Gundrum, and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Antonio V. Anderson appeals from judgments of conviction entered following a jury trial wherein the jury found him guilty of first-degree sexual assault by the use of a dangerous weapon and stalking with a prior conviction for a violent crime, both with domestic abuse enhancers, as well as intimidation of a witness in connection with a felony trial and two counts of contempt of court for violating a protective order. On appeal, Anderson challenges the convictions on the ground that the circuit court erred in allowing the State to introduce other acts evidence pursuant to WIS. STAT. § 904.04(2) (2023-24)[1] and also contends the evidence was insufficient to support the first-degree sexual assault conviction. We conclude the circuit court did not err in allowing the State to introduce the challenged other acts evidence and that the State presented sufficient evidence at trial from which the jury could reach a guilty verdict as to the first-degree sexual assault charge. Accordingly, we affirm.

## BACKGROUND

¶2 In June 2021, the State charged Anderson with one count of first-degree sexual assault contrary to WIS. STAT. § 940.225(1)(b), one count of strangulation and suffocation (with a previous conviction) contrary to WIS. STAT. § 940.235(2), and one count of stalking (previous conviction for a violent crime) contrary to WIS. STAT. § 940.32(2m)(a).[2] Each count also carried a domestic abuse enhancer. *See* WIS. STAT. §§ 968.075(1)(a) and 973.055(1). These charges

---

[1] All subsequent references to the Wisconsin Statutes are to the 2023-24 version.

[2] These charges relate to Appeal No. 2024AP2294-CR (Waukesha County Circuit Court Case No. 2021CF878). Anderson stipulated that he had previously been convicted of a violent crime in Wisconsin, as defined in WIS. STAT. § 939.632(1)(e)1., prior to May 2021.

followed T.H.'s[3] May 31, 2021 report that on May 26, 2021, Anderson had slapped her, sexually assaulted her at knife-point, and had attempted to strangle and suffocate her with his bare hands and a pillow, and that between May 26 and May 31, Anderson had repeatedly sent her threatening messages. The State filed additional charges—one count of felony intimidation of a witness contrary to WIS. STAT. § 940.43(7) and two misdemeanor counts of contempt of court (punitive sanction) contrary to WIS. STAT. §§ 785.03(1)(b) and 785.04(2)(a)—in December 2021.[4]

¶3 According to the June 2021 complaint, on May 31, 2021, T.H. contacted the City of Waukesha Police Department to report the sexual assault, attempted strangulation/suffocation, and threatening messages. T.H. met with Detective Steve Guth and explained that Anderson, with whom she was in a romantic relationship and shared three young children, became angry with her after discovering a 2015 Facebook post and accused her of being unfaithful. She reported Anderson slapped her, which caused her to fear for her safety, and that Anderson then put his hands around her neck and applied pressure, although not so much so that she could not breathe. Anderson subsequently put a pillow over her face to suffocate her and stopped only when their 19-month-old child began crying. While T.H. took care of the child, Anderson went to the kitchen and returned with a large chef's knife, at which point he forced T.H. to the basement and made her kneel on a red towel while performing oral sex with the knife held to her throat. Anderson subsequently left the residence to return a vehicle to a friend

---

[3] We use initials to protect the victim's privacy. *See* WIS. STAT. RULE 809.19(1)(g).

[4] These charges relate to Appeal No. 2024AP2295-CR (Waukesha County Circuit Court Case No. 2021CF1938).

in Milwaukee. T.H. reported she feared for her own safety as well as that of her children.

¶4 After describing these events to Detective Guth, T.H. recounted the events in greater detail to Officer Bradley Condon, who recorded the interview. T.H. told Officer Condon that Anderson, while holding the pillow over her face, said "I'm going to kill you, I should have killed you a long time ago[,]" and that he continued to make similar statements such as "I'll cut you into pieces" while forcing her to the basement at knifepoint. T.H. also reported that after leaving the residence, Anderson continued to call and message her to pick him up in Milwaukee and that while she "played along" and said she would, she did not pick him up and stayed at a different residence rather than returning home. T.H. also told Officer Condon she changed her phone number due to Anderson's frequent messaging, and she provided Officer Condon with screen shots of text messages and Facebook messages Anderson had sent her. The interview recording and text and Facebook messages were presented to the jury at Anderson's subsequent trial.

¶5 On June 2, 2021, just two days after reporting the altercation, T.H. contacted Officer Condon and recanted. In an affidavit filed on September 15, 2021, T.H. stated she called and emailed Officer Condon to inform him she had "made the allegation up and did not want to … pursue no contact or restraining order." T.H. also stated in the affidavit that the real reason she and Anderson argued on May 26 was because she was upset upon learning Anderson was married and getting divorced. T.H. stated she was "devastated" and "betrayed and humiliated" and that she "filed a false police report" because she "wanted him to see how it felt to have someone that love[s] you betray you and break your heart." She also said Anderson has a key to her home and that "[t]here were no signs of stalking[.]" The affidavit additionally recounted that T.H. had "show[n]

[Detective Guth] the app" she used to "make up" the threatening messages and repeatedly described Anderson as an "innocent man." T.H. also expressed frustration that a social worker had interviewed her children about their home life while they were at daycare without her permission and asserted her father, O.H.,[5] had been brainwashing her second-oldest child.

¶6 Police arrested Anderson on June 11, 2021. Detective Guth monitored Anderson's jail phone calls, and those phone calls ultimately formed the basis for the December 2021 felony intimidation of a witness charge filed in Waukesha County Circuit Court Case No. 2021CF1938. According to the complaint filed in that case, Anderson "made over 1100 phone calls" lasting approximately 15 minutes each while in the Waukesha County Jail. The complaint describes calls between Anderson and his sister confirming she had destroyed a phone Detective Guth had sought to obtain, and between Anderson and his then-wife asking her to contact the cell phone company about destroying his phone records and telling her to "Tell cuz don't let the mechanics fix the car" and to "[k]eep the mechanics away from her, for real!"

¶7 The December complaint also describes calls between early August and late September 2021 that Detective Guth learned about from a Waukesha County Sheriff's Department detective who had discovered multiple calls to T.H.'s phone number while investigating another matter. In those calls, Anderson and other individuals suggested to T.H. that if she did not appear at trial, the district attorney would have to dismiss the charges because Anderson had a right

---

[5] We also use initials in referring to T.H.'s family members to further protect her privacy. *See* WIS. STAT. RULE 809.81(8).

5

to face his accuser. The State subsequently filed additional charges—two counts of contempt of court as a punitive sanction—after discovering Anderson contacted T.H. following a December 17, 2021 protective order prohibiting Anderson from communicating with T.H. and their children.

¶8      The State filed a pretrial motion to admit other acts evidence pursuant to WIS. STAT. § 904.04(2).[6]  The State asserted the other acts evidence was admissible to show intent, motive, and context. The circuit court granted the motion at a January 2022 motion hearing.

¶9      Following a three-day jury trial in September 2022, the jury found Anderson guilty of first-degree sexual assault, stalking with a previous conviction of a violent crime, intimidation of a witness in a felony case, and the two counts of contempt. The jury found Anderson not guilty of strangulation and suffocation. The circuit court thereafter sentenced Anderson to ten years of initial confinement and ten years of extended supervision for first-degree sexual assault with a dangerous weapon, three years of initial confinement and three years of extended supervision for stalking (consecutive), four years of initial confinement and four years of extended supervision for intimidation of a witness in a felony case (concurrent), and one year terms of confinement for each of the two contempt of court counts (concurrent).  At sentencing, Anderson also pled guilty to a misdemeanor intimidation of a victim charge in an unrelated case for which the court sentenced him to a consecutive six-month jail term.

---

[6] The State also filed a motion to join the two cases for trial pursuant to WIS. STAT. § 971.12(4), which the circuit court granted. Anderson does not challenge that decision on appeal and we therefore do not address it further.

¶10    Additional facts relevant to the issues raised on appeal will be developed in greater detail below.

## DISCUSSION

### I. Standard of Review

¶11    Whether to admit or exclude other acts evidence is within the circuit court's discretion.  *See* ***State v. Davidson***, 2000 WI 91, ¶38, 236 Wis. 2d 537, 613 N.W.2d 606; ***State v. Gutierrez***, 2020 WI 52, ¶17, 391 Wis. 2d 799, 943 N.W.2d 870.  "We review a circuit court's admission of other-acts evidence for an erroneous exercise of discretion." ***State v. Marinez***, 2011 WI 12, ¶17, 331 Wis. 2d 568, 797 N.W.2d 399.  We will "uphold[] a circuit court's exercise of discretion to admit or exclude evidence where it 'examined the relevant facts, applied a proper legal standard, and, using a demonstrated rational process, reached a reasonable conclusion.'" ***Gutierrez***, 391 Wis. 2d 799, ¶21 (quoting ***State v. Chamblis***, 2015 WI 53, ¶20, 362 Wis. 2d 370, 864 N.W.2d 806).  "[A]ppellate courts should 'look for reasons to sustain a [circuit] court's discretionary decision.'" ***Gutierrez***, 391 Wis. 2d 799, ¶27 (quoting ***State v. Wiskerchen***, 2019 WI 1, ¶18, 385 Wis. 2d 120, 921 N.W.2d 730).

¶12    "The question of whether the evidence was sufficient to sustain a verdict of guilt in a criminal prosecution is a question of law, subject to our de novo review." ***State v. Smith***, 2012 WI 91, ¶24, 342 Wis. 2d 710, 817 N.W.2d 410.  "[W]e consider the evidence in the light most favorable to the State and reverse the conviction only where the evidence 'is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt.'" ***Id.*** (quoting ***State v. Poellinger***, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990)).  If any possibility exists "that the trier of fact could have

drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, an appellate court may not overturn a verdict even if it believes that the trier of fact should not have found guilt based on the evidence" presented at trial. *Poellinger*, 153 Wis. 2d at 507.

## II. Other Acts Evidence

¶13    We must determine whether the circuit court erred in allowing the State to introduce other acts evidence to establish intent and motive at trial.[7] Because the State only secured testimony regarding one of the eight other acts identified in the motion—that of victim K.G.—we review the circuit court's ruling only as it relates to K.G.

¶14    Anderson contends the circuit court erred in granting the State's other acts motion as to K.G.'s assault because he says that assault was dissimilar in nature and significantly remote in time.  The State responds that the court properly exercised its discretion in allowing the evidence to come in for purposes of motive and intent—particularly in light of the greater latitude rule, which Anderson does not address at all on appeal—because: (1) although 23 years separated K.G.'s and T.H.'s sexual assaults, Anderson was in prison and on supervision for a significant portion of that time; (2) there were unique similarities between the two sexual assaults; and (3) the State established by a preponderance

---

[7] In its other acts motion, the State also asserted the other acts evidence was admissible to provide context, and the circuit court agreed with the State in granting the other acts motion. At trial, however, the court instructed the jury that the other acts evidence had been "received on the issues of motive … and intent[.]"  We therefore focus primarily on motive and intent in reviewing whether the circuit court erroneously exercised its discretion in allowing the State to present the other acts evidence.

of the evidence that although a jury acquitted Anderson of K.G.'s sexual assault, the assault had nevertheless occurred. We agree with the State.

¶15 The State initially identified eight separate incidents between March 1998 and September 2020 it sought to introduce as other acts evidence at trial; however, it ultimately introduced evidence only as to an August 1998 incident wherein Anderson and a co-defendant sexually assaulted K.G.[8] During the assault, Anderson "came into [K.G.]'s bedroom and grabbed her head with his hand, grabbing a fistful of her hair[,]" and "then placed his penis in [her] mouth." Anderson also put a piece of clothing in K.G.'s mouth to gag her, and K.G. "indicated that whenever she started to scream, [Anderson] would push her face into the pillow." Anderson also "placed his penis in [K.G.]'s vagina and anus, and ejaculated on her buttocks and legs." The State charged Anderson with second-degree sexual assault, force or violence; however, a jury found him not guilty.

¶16 The circuit court granted the State's other acts motion "in full" after applying the required three-step *Sullivan* analysis. *See **State v. Sullivan***, 216 Wis. 2d 768, 771-73, 576 N.W.2d 30 (1998). First, the court identified the relevant law and noted that the greater latitude rule applies to sexual assault and domestic violence allegations and that even acquitted conduct can be admitted for other acts purposes. It then considered the basis upon which the State sought to introduce the evidence and concluded each formed a permissible basis for the other acts evidence here. As to motive, the court noted both that "while motive is not an element of any offense" charged here, "it certainly is part of intent[,]" and

---

[8] The State was unable to secure witness testimony regarding the other seven incidents initially identified in its motion.

that "[c]ourts historically allow motive evidence because it provides circumstantial evidence of intent[.]" The court also explained that other acts evidence can "furnish[] part of the context of the crime or is necessary to a full presentation of the case"—particularly in cases of domestic violence and sexual assault where a victim has recanted—because "the history of sexual and domestic abuse offenses committed by the Defendant provides necessary context to help explain the victim's fear and pattern of recantations."

¶17 Next, the circuit court addressed whether the proffered other acts evidence was "relevant and not too remote in time[.]" It determined the other acts evidence was relevant because "intent and motive are both matters of consequence" and that here, "[t]he State asserts that [Anderson]'s motivations were to assert power and control over [T.H.], as he had in the past, with physical violence" and that the evidence "goes to Mr. Anderson's intent against [T.H.] in this case." It therefore determined the other acts evidence was "very, very relevant" because the identified acts "are in large part, similar to aspects or specific charges in this case[,]" and it also explained that "the other acts lend credibility" to T.H.'s initial report to the police in light of her recantation.

¶18 In comparing the charges in this case with the other acts evidence involving K.G., the circuit court specifically noted "the proffered other acts involved conduct that is similar to the very dynamic of power and control, domestic violence, and sexual violence present in this case" and that

> the offer of proof there is that this was a -- sexual violence exerted against the victim in a way that could be seen as being highly similar to the sexual violence in this case; involves forced penis-to-mouth intercourse without consent. It involves the victim describing the Defendant getting her, pushing her head into a pillow whenever she tried to scream. So that's similar to the Defendant's allegation in this case that he suffocated [T.H.] shortly

10

before he led her to the basement and sexually assaulted her.

It therefore determined the other acts evidence was relevant to show Anderson's attempt to assert power and control "by intentionally applying pressure on the throat and/or covering the nose or mouth[,]" which goes to the "element[] … of intent the State must prove for the charge of strangulation/suffocation[,]" that the evidence was related to context, and that the other acts evidence "involved what [it] would characterize as similar acts of violence, similar motivation of power and control and include[d] repeated threats to kill which [the] victim, at least based upon the offer of proof, indicated" caused her to "fear for [her] own safety due to [Anderson's] behavior."  The court similarly noted the other acts evidence was related to the stalking charge given "the course of violent conduct [Anderson] direct[ed] at [T.H.] in this case which put[] her in fear of her safety[.]"

¶19    Turning to remoteness in time, the circuit court noted that although approximately 23 years had passed between K.G.'s assault and the present matter, Anderson had spent seven years and four months—plus additional jail time—in prison, which "significantly reduces that time gap."  The court was therefore satisfied the other acts evidence was not too remote in time, particularly in light of its finding that the other acts evidence was "sufficiently similar and unique[.]"

¶20    Finally, as to whether the other acts evidence was substantially outweighed by unfair prejudice, the circuit court concluded that allowing the State to introduce the other acts evidence would not be unfairly prejudicial because Anderson would be able to cross-examine K.G., and because it would give a limiting jury instruction if Anderson so requested.  The court reaffirmed its ruling immediately prior to K.G. testifying at trial, and it also agreed to give the limiting jury instruction.

11

¶21 K.G. did in fact testify at trial. She described Anderson and another assailant as having assaulted her in her home and stated Anderson "shoved his shirt in [her] mouth as far as he could and when he was doing [that] to [her], he had his hands on [her] throat and was choking [her] and pushing [her] face into the pillow." K.G. said this made her think she "was gonna die" and that she could not breathe normally. K.G. also testified Anderson "raped [her] and then he sodomized [her]" and that "[h]e first raped [her] vaginally, and then he raped [her] and sodomized her" with "[h]is penis." K.G. reported the incident to police, and she and a friend began receiving threatening phone calls from unidentified individuals stating she and her friends and family would be killed and that she felt scared. Neither party asked K.G. to identify Anderson in court during the course of her testimony; however, she did identify him by name. The jury did not learn Anderson had been tried and acquitted of sexually assaulting K.G., as the circuit court had previously ruled that the fact of the acquittal was not relevant. Following K.G.'s testimony, the court read the jury the cautionary other acts jury instruction and instructed that if it determined the "conduct did occur, [it] should consider it only on the issues of motive and intent" and that it was not to "consider this evidence to conclude that [Anderson] has a certain character or a certain character trait and that [he] acted in conformity with that trait or character with respect to the offenses charged in this case."

¶22 We have reviewed the circuit court's rationale in granting the other acts motion and we conclude the circuit court did not erroneously exercise its discretion in granting the State's motion.

¶23 WISCONSIN STAT. § 904.04(2) governs the admissibility of other acts evidence:

12

> Except as provided in par. (b) 2., evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Sec. 904.04(2)(a). In determining the admissibility of proffered other acts evidence, a circuit court applies the *Sullivan* three-step analytical framework. *Sullivan*, 216 Wis. 2d at 772-73. "Evidence of other crimes, wrongs, or acts may be admitted if: (1) offered for an acceptable purpose under WIS. STAT. § 904.04(2); (2) relevant under WIS. STAT. § 904.01; and (3) its probative value is not substantially outweighed by the danger of unfair prejudice, confusion, or delay under WIS. STAT. § 904.03." *Gutierrez*, 391 Wis. 2d 799, ¶29 (citing *Sullivan*, 216 Wis. 2d 768, 772-73). In determining whether other acts evidence is relevant under the second prong, the court first determines "whether the other acts evidence relates to a fact or proposition that is of consequence to the determination of the action." *Sullivan*, 216 Wis. 2d at 772. If so, the court then considers "whether the evidence has probative value, that is, whether the other acts evidence has a tendency to make the consequential fact or proposition more probable or less probable than it would be without the evidence." *Id.*

¶24 The greater latitude rule allows for a more liberal admission of prior acts in certain cases, including those involving sexual assault or domestic abuse allegations. WIS. STAT. § 904.04(2)(b)1. The greater latitude rule is applied to each of *Sullivan*'s three prongs; however, its application "does not relieve a [circuit] court of the duty to ensure that the other acts evidence is offered for a proper purpose, is relevant, and its probative value is not substantially outweighed by undue prejudice." *Gutierrez*, 391 Wis. 2d 799, ¶29; *see also* **State v. Dorsey**, 2018 WI 10, ¶¶32-33, 379 Wis. 2d 386, 906 N.W.2d 158. Where the greater

13

latitude rule applies, "evidence of any similar acts by the accused is admissible, and is admissible without regard to whether the victim of the crime that is the subject of the proceeding is the same as the victim of the similar act." Sec. 904.04(2)(b)1.; *see also **Dorsey***, 379 Wis. 2d 386, ¶¶32-33. Acquitted conduct can be considered for other acts purposes, *see **State v. Landrum***, 191 Wis. 2d 107, 116-17, 528 N.W.2d 36 (Ct. App. 1995), and the burden of proof for establishing the other act occurred is the preponderance of the evidence, *see **State v. Schindler***, 146 Wis. 2d 47, 54, 429 N.W.2d 110 (Ct. App. 1988).

¶25 Here, the circuit court properly applied each of ***Sullivan***'s three prongs within the context of the greater latitude rule and reached a reasonable conclusion regarding the admissibility of the other acts evidence. First, the court reasonably concluded the State sought to introduce the other acts evidence for the permissible purposes of intent and motive pursuant to WIS. STAT. § 904.04(2). The court explained that as it relates to the alleged sexual assault, the other acts evidence satisfied motive and intent because it would assist the jury in understanding "how [Anderson] sought sexual gratification by force." *See, e.g.*, ***Dorsey***, 379 Wis. 2d 386, ¶9. It also explained that the other acts evidence would provide context for the alleged conduct involving the intention to intimidate and instill fear in the victim, particularly in light of T.H.'s recantation, because "the history of sexual and domestic abuse offenses committed by [Anderson] provides necessary context to help explain the victim's fear and pattern of recantations." *See, e.g.*, ***State v. Hunt***, 2003 WI 81, ¶¶58-59, 263 Wis. 2d 1, 666 N.W.2d 771 (other acts evidence admissible "to show the context of the crime and to provide a complete explanation of the case" "and to establish the credibility of victims and witnesses in light of their recantations"). The court could reasonably conclude the

14

other acts evidence was admissible for these purposes, and it did not err in doing so.

¶26 The circuit court could also reasonably conclude, as it did, that the other acts evidence was relevant—that it "relate[d] to a fact or proposition that is of consequence" and that it had probative value. *See Sullivan*, 216 Wis. 2d at 772. "The probative value of the other acts evidence is measured by the factual similarities it shares with the charged conduct." *Gutierrez*, 391 Wis. 2d 799, ¶34. However, the "past offense need not be identical to the charged offense in order to be probative[,]" *State v. Davidson*, 2000 WI 91, ¶72, 236 Wis. 2d 537, 613 N.W.2d 606, and a factual similarity of the evidence may overcome remoteness in time, *see State v. Mink*, 146 Wis. 2d 1, 16, 429 N.W.2d 99 (Ct. App. 1988); *State v. Plymesser*, 172 Wis. 2d 583, 596, 493 N.W.2d 367 (1992); *State v. Kuntz*, 160 Wis. 2d 722, 749, 467 N.W.2d 531 (1991).

¶27 The other acts evidence presented here is consequential to the case, as intent is an element of the alleged conduct. *See* WIS. STAT. § 940.225(1)(b) and (5)(b) and (c) (sexual assault), WIS. STAT. § 940.235 (strangulation and suffocation), and WIS. STAT. § 940.32(2m)(a) (stalking). This evidence is also of consequence because it bolsters T.H.'s credibility as to her initial report to the police—particularly in light of her recantation—as it reveals another instance in which Anderson used power, control, and threats in pursuing sexual gratification. *See, e.g.*, *Gutierrez*, 391 Wis. 2d 799, ¶33 (explaining that a victim's credibility is a consequential fact); *see also Dorsey*, 379 Wis. 2d 386, ¶50 ("credibility is particularly probative in cases that come down to he-said-she-said"). This evidence also has probative value due to the similarities between K.G.'s assault and T.H.'s sexual assault such as Anderson having put his hands around T.H.'s

15

neck and holding a pillow against T.H.'s face just as he had during K.G.'s assault.[9] Likewise, both sexual assaults involved forced penis-to-mouth oral sex.

¶28     Although the 23 years that passed between the two assaults was not insignificant, it ultimately was not unreasonable for the circuit court to conclude the two assaults were not too remote in time so as to render the other acts evidence irrelevant, particularly in light of the seven-plus years[10] Anderson spent in prison or on supervision during that time period.  *See, e.g.*, ***Kuntz***, 160 Wis. 2d at 747-48 (in considering remoteness in time, courts should consider "not only the time that has passed, but also the opportunities presented over that period for the defendant to repeat the acts"); ***Mink***, 146 Wis. 2d at 16 (22-year time span did not render other acts evidence irrelevant).  Moreover, the similarity between the two sexual assaults functions to offset the intervening period of time, *see, e.g.*, ***State v. Opalewski***, 2002 WI App 145, ¶20, 256 Wis. 2d 110, 647 N.W.2d 331, and in balancing the similarities and remoteness of time, we are mindful that the greater latitude rule applies to the other acts evidence offered here.

¶29     Finally, the circuit court determined the other acts evidence's probative value was not unduly prejudicial, particularly because: (1) it would not allow the other acts evidence unless K.G. testified and was therefore subject to

---

[9] Although the jury acquitted Anderson on the strangulation and suffocation charge, we consider the allegations for purposes of determining whether the circuit court erroneously exercised its discretion as to its decision to grant the State's other acts motion.

[10] At the motion hearing, the State informed the circuit court that Anderson had been in the prison system for seven years and four months during the relevant time period, which did not include additional jail time Anderson served.  In its appellate brief, the State contends the overall time period amounts to approximately ten years.

cross-examination; and (2) Anderson could request a limiting jury instruction (which the court ultimately gave). This conclusion was not unreasonable.

¶30 Based on the foregoing, we are satisfied the circuit court "reviewed the relevant facts, applied a proper standard of law, and using a rational process, reached a reasonable conclusion." *See State v. Payano*, 2009 WI 86, ¶4, 320 Wis. 2d 348, 768 N.W.2d 832. Accordingly, we conclude the circuit court did not erroneously exercise its discretion in permitting the State to introduce the other acts evidence of K.G.'s assault at trial.

**III. Sufficiency of the Evidence**

¶31 We must also determine whether the evidence introduced at trial was sufficient to support the first-degree sexual assault conviction.[11] Anderson challenges the sufficiency of the evidence and argues that T.H. provided a reasonable explanation at trial for having lied when she initially reported the assault—that she was angry upon learning Anderson was already married. He also argues the lack of physical evidence, what he describes (without elaboration) as his cell mate Jason Jankowski's "patently incredible" testimony, and the jury's acquittal on the strangulation charge further support his sufficiency of the evidence challenge. We disagree.

¶32 When reviewing "a challenge to the sufficiency of the evidence, the test we apply is whether the evidence is so insufficient in probative value and force that, as a matter of law, no reasonable jury could have found guilt beyond a

---

[11] Anderson challenges the sufficiency of the evidence only as to the first-degree-sexual assault conviction.

reasonable doubt." *State v. Tarantino*, 157 Wis. 2d 199, 218, 458 N.W.2d 582 (Ct. App. 1990); *Poellinger*, 153 Wis. 2d at 507. An appellate court must "uphold a conviction if any reasonable inferences supports it[,]" *see State v. Steffes*, 2013 WI 53, ¶23, 347 Wis. 2d 683, 832 N.W.2d 101 (citing *Poellinger*, 153 Wis. 2d at 507), and if more than one inference can reasonably be drawn from the evidence, we will follow the inference that supports the jury's verdict so long as the evidence was credible as a matter of law, *State v. Allbaugh*, 48 Wis. 2d 807, 809, 436 N.W.2d 898 (Ct. App. 1989); *Poellinger*, 153 Wis. 2d at 507. The trier of fact is the sole arbiter of a witness's credibility, and where evidence "could support contrary inferences, the trier of fact is free to choose among conflicting inferences of the evidence and may, *within the bounds of reason*, reject that inference which is consistent with the innocence of the accused." *Poellinger*, 153 Wis. 2d at 506.

¶33    The State charged Anderson with first-degree sexual assault with use of a dangerous weapon contrary to WIS. STAT. § 940.225(1)(b), which required the State to prove Anderson had "sexual contact or sexual intercourse with [T.H.] without [T.H's] consent … by use or threat of use of a dangerous weapon[.]" "Sexual intercourse" includes oral sex. *See* § 940.225(5)(c); *see also* § 940.225(5)(b). As set forth in detail below, the jury heard testimony from multiple witnesses over the course of Anderson's three-day jury trial regarding the sexual assault charge. Although T.H. testified the alleged assault never occurred, and although her father and daughter both testified they did not recall having previously provided anyone with information regarding the assault and denied any such conversations had occurred, much of the witness testimony and evidence submitted corroborated the sexual assault allegations set forth in the complaint and in T.H.'s initial report to the police.

18

¶34 At trial, T.H. denied that Anderson had engaged in the alleged violent conduct. Instead, T.H. said she became upset after learning Anderson was already married. She denied any argument over a 2015 Facebook post, denied having a Facebook account, and testified she did not recall talking to Officer Condon about an argument with Anderson or allowing Officer Condon to look through her phone. T.H. likewise said she did not remember meeting with Officer Condon to report the assault and that she did not remember Officer Condon recording their conversation. When shown screenshots of text messages from Anderson to T.H. on May 26 and 27, 2021, as well as screenshots of Facebook messages from Anderson, T.H. repeatedly denied recalling the messages or conversations. T.H. also denied having stayed at her father, O.H.'s house, following these events, and she called her father "a liar." She confirmed, however, that she recognized an email she sent to Detective Guth on June 5, 2021, recanting the allegations she had previously made and said she "was telling the truth" in that email. T.H. also repeatedly denied that Anderson had told her to recant.

¶35 In addition to repeatedly denying the alleged conduct occurred, T.H. also denied recalling August and September 2021 conversations with Anderson while he was in jail in which Anderson and/or another inmate told her "that the 14th Amendment has to do with the rights of the accused and facing their accuser" and "if there's no face, there'd be no case[.]" T.H. likewise did not recall having been with Anderson and her children at the Ingleside Hotel on June 1, 2021—even when presented with a receipt from that date identifying her as the guest.

¶36 In contrast to T.H.'s trial testimony, the jury heard Officer Condon's May 31, 2021 recorded interview with T.H. in which she reported Anderson repeatedly said he would kill her and described Anderson as having been upset

19

about comments other men had made on T.H.'s Facebook posts in 2015. T.H. also said she felt fearful after Anderson slapped her without her consent and described how Anderson placed both hands around her neck—although not with enough force to impede her breathing—and then held a pillow over her face when he realized she could still breathe, how he grabbed a chef's knife with an eight-to-ten inch blade from the kitchen and ordered her to go downstairs, and how Anderson forced her to kneel on a red towel in the basement while performing oral sex while he held a knife to her throat. She also explained that Anderson left shortly thereafter to pick up some people and return a car he had borrowed. T.H. also described multiple threatening text messages and Facebook messages she received from Anderson, and she stated she had changed her phone number because Anderson continued trying to contact her.

¶37 T.H.'s daughter Agnes,[12] who was five years old at the time of trial, and T.H.'s father, O.H., also testified at trial. In large part, both denied any knowledge of the alleged conduct. In regard to Agnes's testimony, Agnes agreed it was important to tell the truth; however, when asked if she "promise[d] to tell … the truth," she shook her head no and said "I don't know" when asked why she would not "promise to tell … the truth." The circuit court reiterated to Agnes that it was important that she answer the questions truthfully, and after answering questions about her family, she generally denied having spoken with a social worker and Detective Guth while at daycare and denied telling anyone she had seen Anderson and T.H. fighting, that she had seen Anderson hit T.H. or put a gun

---

[12] Agnes is a pseudonym, as Anderson and T.H. have two daughters with the initials A.H. While the State sought to introduce both daughters' testimony at trial, Alice (also a pseudonym), their other daughter, was uncooperative.

20

to T.H.'s head, or that Anderson had put a knife to T.H.'s throat saying, "I should kill you."

¶38    O.H. testified he did not recall telling Detective Guth about Anderson having pulled a gun on T.H., and when specifically asked whether he "remember[ed] telling Detective Guth that Mr. Anderson pulled a knife and a gun on [T.H.,]" he said he "never told him nothing about a gun" but later admitted having told Detective Guth about a knife.  O.H. also denied that T.H. had told him she was scared of Anderson.  On cross-examination, O.H. confirmed that during the May 2021 timeframe, he had been using drugs and had been using crack "[o]ff and on."

¶39    In light of T.H.'s recantation, the State introduced testimony from Maria Rozek, a licensed advanced practice social worker, who described the impact trauma may have on a victim and explained that "[t]he impact of trauma on memory and on communication is huge when someone is in fear for their life or in fear for their wellbeing, and that's going to affect how someone may report to law enforcement."  Rozek also testified about the "Power and Control Wheel," which she described as a tool that "delineates different types of abuse that can occur in an intimate partner relationship[,]" and explained that the wheel identifies various types of abuse "where someone in a relationship can become overpowered or controlled by another person in a very specific type of way."  Rozek confirmed the types of abuse include coercion and threats, of which she provided numerous examples—including physical and emotional threats, intimidation, emotional abuse, isolation, using children against the other person, abusing privilege, and minimizing, denying, and blaming.  Rozek also explained it is not uncommon for victims to delay disclosure of domestic violence or sexual violence or to recant those allegations once made.  Although Rozek did not testify about the specific

21

facts in this case, her testimony provided a framework to assist the jury in understanding the "power and control and the dynamics of abuse that can control in a relationship."

¶40    Officer Condon and Detective Guth both testified as to their interactions with T.H.    Officer Condon's testimony was consistent with the allegations set forth in the June 2021 complaint, and he verified the recording played for the jury from the day T.H. initially reported the assault. Officer Condon also confirmed T.H. had shown him texts and Facebook messages between Anderson and T.H. dated May 26 through May 30, 2021, that he had taken screenshots of those message, and that messages Anderson sent to T.H. included: "when I get there I'ma choke the fuck out you then bitch"; "I'ma teach you to quit playing with me watch"; "I don't give a fuck and I'm not fucking with yo bitch ass nomore but I'ma come beat the fuck outta you n choke the fuck outta you before I'm done today bitch"; "If you don't answer this phone I'm going to kill you when I get there I'm done playing games with you"; and "Bitch you better be out cheating cuz when I see you I'ma beat yo muthafuckin ass like you did for not answering this phone[.]"    The State presented the full set of messages to the jury at trial, which the circuit court admitted into evidence.    Officer Condon said T.H. told him she felt "[a]fraid" upon receiving these messages.

¶41    Officer Condon additionally confirmed he went to T.H.'s residence to collect evidence after she contacted police, that he collected the knife T.H. said Anderson used during the assault, which was shown to the jury, and that T.H. showed him the red towel Anderson made her kneel on while being forced to perform oral sex at knifepoint.    Officer Condon explained that although he took pictures of the red towel, he did not collect it as evidence because T.H. told him she washed it after the assault.

22

¶42    Like Officer Condon, Detective Guth testified consistently with the allegations set forth in the complaints.  He explained he listened to Officer Condon's recorded interview with T.H. and that after reviewing the evidence Officer Condon had collected, he determined there would be little value in testing the knife and pillow for DNA evidence because Anderson was regularly in T.H.'s residence and he would have expected to find both Anderson's and T.H.'s DNA on those objects.

¶43    Detective Guth spoke with T.H. on June 3, 2021, regarding her recantation, at which point she told him "that basically she wanted to apologize for wasting [his] time and the police department's time because she made up these allegations" about Anderson.  As to the messages T.H. had shown Officer Condon, Detective Guth explained T.H. told him she had used the "Text Me Now app on her phone" to create the messages and that she had sent them to herself; however, when he tried to replicate what T.H. had described on his own phone with a known phone number, as T.H. had told him she had done with Anderson's phone number, he was unable to do so because the app would not allow him to select a phone number that was already in use.  He confirmed that when he told T.H. he could not replicate what she had described doing, she admitted Anderson had sent the threatening messages.  He further testified T.H. admitted she and Anderson fought over his having been married and a 2015 Facebook post Anderson believed showed T.H. had cheated on him, that Agnes, the younger of her two daughters, had been "peering down the steps" during at least part of the altercation between T.H. and Anderson, and that Agnes's comment to O.H. about Anderson having held a knife and gun to T.H.'s head was true.

¶44    Detective Guth also described the "trap and trace warrant" method utilized to "ping" where Anderson's cell phone had been located during the

23

relevant time period and testified that the "pings" were consistent with the locations T.H. had described in her initial police report and with Anderson having been at the Ingleside Hotel. Maps showing the "ping" locations associated with Anderson's cell phone number were presented to the jury and received into evidence.

¶45    During his investigation, Detective Guth attended an interview with social worker Jennifer Davis, whose testimony is described below, at which time Davis interviewed Agnes at her daycare. According to Detective Guth, Agnes told them "her daddy is evil and needs to go to jail[,]" that "daddy put a knife to her mommy and a gun to her mommy[,]" and that his report from the interview reflected Agnes told them Anderson "put a knife on my ma's neck and said, 'I should kill you[.]'"

¶46    Finally, Detective Guth recounted that on June 16, 2021, he was notified that inmate Jankowski wished to speak with him regarding Anderson, his cellmate at the Waukesha County Jail. According to Detective Guth, Jankowski described phone calls he overheard Anderson had about keeping someone away from the "mechanics," which Detective Guth believed to mean investigators. Detective Guth thereafter obtained records of some of Anderson's phone calls, including some with T.H. The State played the recordings of those calls for the jury, which were admitted into evidence. Detective Guth also confirmed he received information from a Waukesha County Sheriff's Detective in December 2021 regarding additional suspicious calls between Anderson and other individuals that suggested Anderson was attempting to persuade T.H. from cooperating with the investigation and to keep her from testifying at trial. Those calls, along with calls between Anderson and T.H. that occurred after the circuit

24

court entered December 17, 2021 order prohibiting Anderson from contacting T.H., were also played for the jury and admitted into evidence.

¶47     Inmate Jankowski briefly shared a cell with Anderson in June 2021 at the Waukesha County Jail and testified he reached out to law enforcement after Anderson told him, in Jankowski's words, "he had made his baby mama suck his dick with a knife but that he did not ejaculate, so … he did not think it was a big deal[,]" and that Anderson told him he forced T.H. to perform oral sex at knifepoint because "[h]e wanted to put his, and I quote, 'Baby mama in check because sometimes you have to do that,' end quote."  Jankowski also testified Anderson told him "the mother of his children had gone to the police after the fact and recanted her statement or tried to recant her statement … [and] that she had even went so far as to write an email to the DA's office asking for a lawyer[,]" as well as that Anderson told him he had helped T.H. draft an email to send to the DA's office.  Jankowski also overheard Anderson's phone calls with family and/or friends in which Anderson asked them to convince T.H. to drop the charges, and he heard Anderson tell them "to keep the mechanics away from the car[,]" which he, based on his prior experience as a criminal defense attorney, believed to be "slang referring to police officers[.]"  Jankowski confirmed he did not see any of Anderson's court-related paperwork that might have included the details he testified about and explained he contacted law enforcement because what Anderson had said "was very callous" and "very horrific" and that he did not get anything in exchange for testifying at Anderson's trial.

¶48     Jennifer Davis, a Waukesha County Health and Human Services social worker, testified that she interviewed Agnes at her daycare on June 10,

2021, following reports of potential violence at Agnes' home.[13] Davis did not obtain T.H.'s permission prior to doing so because the report she received indicated T.H. likely would not cooperate, T.H. "was an alleged maltreater as well[,]" and she did not want to risk anyone influencing Agnes prior to the interview. According to Davis, Agnes was four at the time, talkative, and spontaneously offered information such as describing how "her dad put a gun to her mom's head and a knife to her neck and that her dad hits her mom and that he was evil and should go to jail."[14]

¶49 Having reviewed this testimony and the exhibits presented at trial, we readily conclude sufficient evidence supports the first-degree sexual assault conviction. As reflected above, the jury heard extensive testimony from multiple witnesses that, despite T.H.'s recantation, corroborates her initial May 31, 2021 police report. For example, the jury heard T.H.'s initial recorded interview during which she provided a detailed account of what transpired between T.H. and Anderson on May 26, 2021, and the State introduced text messages, Facebook messages, and location data from Anderson's cell phone consistent with both the information T.H. had provided at that time and Anderson's known whereabouts. The State also introduced testimony describing the role power and control can have on romantic relationship dynamics, particularly in the context of domestic

---

[13] Davis interviewed both Agnes and Alice; however, we refer only to Agnes because the State dismissed Alice as a witness before providing any substantive testimony.

[14] Davis also described the process she used while interviewing Agnes and testified as to the training she has received in interviewing children and in conducting forensic interviews. Anderson called an expert witness, Dr. Anthony Jurek, to testify on his behalf regarding the proper procedures for conducting forensic interviews of children. Even assuming the jury gave weight to Dr. Jurek's testimony, that testimony clearly did not outweigh the State's evidence so as to render the evidence insufficient to support the sexual assault conviction.

abuse, and the jury also heard K.G.'s testimony about the similarities between her prior sexual assault and T.H.'s sexual assault.

¶50    Officer Condon's, Detective Guth's, and Davis's testimony regarding Agnes's initial report to both Davis and O.H. as to having seen Anderson hold a knife to T.H.'s head, as well as T.H.'s confirmation to O.H. that Agnes was correct, provided additional corroborating evidence regarding the sexual assault. Given the conflicting testimony, the jury clearly determined their testimony to be credible and Agnes's and O.H.'s contrary testimony to be incredible. The State also introduced phone recordings from the jail in which Anderson and/or other inmates sought to persuade T.H. from moving forward with this case, and those recordings were consistent with the testimony Jankowski provided. Moreover, Jankowski's testimony that Anderson told him "he had made his baby mama suck his dick with a knife" was consistent with T.H.'s initial allegations. The jury clearly found this testimony to be credible as well.

¶51    Based on the totality of this evidence, it is evident the jury did not find T.H.'s recantation or O.H.'s and Agnes's general denials as to their prior statements to be credible and instead concluded the credible testimony and evidence adduced at trial was that which corroborated T.H.'s initial report. This corroborating evidence was substantial, and the jury's conclusion was not unreasonable. Accordingly, we cannot say "the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *See **Poellinger***, 153 Wis. 2d at 507.

¶52    As a final note, the jury's acquittal on the strangulation and suffocation charge does not save Anderson's sufficiency of the evidence

challenge. As the State points out, WIS. STAT. § 940.235 requires that the actor "intentionally *impedes* the normal breathing or circulation of blood by applying pressure on the throat or neck or by blocking the nose or mouth of another person[.]" (Emphasis added.) However, during the recorded interview, T.H. told Officer Condon that she *could* breathe while Anderson's hands were around her neck, and there was a general lack of evidence as to whether she could or could not breathe when Anderson held a pillow over her face. Thus, the jury may have believed those acts, like the sexual assault, occurred, but that the State did not establish the necessary requirement that T.H.'s breathing or circulation be "impaired." The guilty verdict on the sexual assault count and acquittal on the strangulation and suffocation count are not in conflict.

## CONCLUSION

¶53 In summary, we conclude the circuit court did not erroneously exercise its discretion in allowing the State to introduce other acts evidence regarding K.G.'s 1998 sexual assault at trial, and despite T.H.'s recantation, the State presented sufficient evidence at trial to support Anderson's conviction for first-degree sexual assault with a dangerous weapon as charged. Accordingly, we affirm.

*By the Court.*—Judgments affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.